Soccer Field Next case is Kane, Tennessee, at Al versus the United States, 06-5045. Mr. Schultz. Thank you, Your Honor. May it please the Court. The government's actions in this case have deprived Kane, Tennessee of all economic viable use of its coal estate, thus constituting a categorical taking under the Supreme Court's decision in Lucas. Kane seeks compensation for the loss in value of its coal estate, not its legally distinct surface estate. And the government's attempt to make Kane's surface estate legally relevant to the categorical takings analysis is, in this Court's own words in Whitney Benefits, completely off the mark. Because SMACRA, the Surface Mining Control and Reclamation Act, deprived Kane, Tennessee of its coal rights, not its surface rights. Counsel, in Whitney Benefits, though, isn't that case different? Because in that case, they didn't own the surface rights. This wasn't—Whitney didn't involve a case where land was purchased fee simple, everything in a bundle. Whitney involved a case where they only owned the rights to mine and they had to separately buy surface rights if they wanted those. That is correct, Your Honor. The—Whitney's lessee subsequently purchased surface rights in order to facilitate the mining of its coal estate. But I would submit that it is a physical impossibility to make any use of a coal estate unless you have some access to the surface. If it's surface mining, you need a great deal of surface area. If it's underground mining, you at least need enough for a box cut. And therefore, there will always be some requirement to have a surface estate in order to make any profitable use of a coal estate. In this case, it just so happens that the coal estate was offered contemporaneously with the surface estate. It was marketed as one bundle and Kane purchased it as such. But it seems to be unfair to penalize Kane simply because it purchased two estates at one time rather than in Whitney where you have a purchase of the coal estate and subsequently a surface estate. But if we open the door in this case to say that you can parse up the estate into just coal, why not also say, hey, there's a timber estate and there's also a residential portion of the estate? I'm just concerned about when someone buys land in Fee Simple, parsing it up into various components so that we can always make a Lucas case out of it. We can always say there's a complete taking of one aspect of the property. Certainly, Your Honor, that is a legitimate concern and it raises the idea of a conceptual severance. But I don't think we have any danger of that in this case because under Tennessee law, there is a rich history of protecting the mineral estate as a separate estate under the state's property law, just as in Wyoming from where Whitney Benefits arose. So there is much less danger that we will have enterprising plaintiffs merely trying to shoehorn their claim into the Lucas framework. And I see your point if we actually follow Tennessee law in this case, but you're well versed in our case law and your briefs show it. And in our case of cyber versus the United States, which is federal circuit precedent, that we don't have the option to disregard as a panel. We say state law does not determine how property interests are to be aggregated. And they say it specifically with regard to whether a parcel is a whole approach and whether analysis should be taken under Lucas, agents, or Penn Central. So as a panel, we can't disregard that. We can't say, well, in this case, we're going to use state law rather than other law because it's Tennessee or whatever, no matter how compelling that state law might be. Your Honor, Kane is in perfect agreement with that. We do not contend that the state law determines the relevant parcel analysis, but we do contend that state law informs the nature of the property right that is at issue. The Supreme Court said as much in the Washington Legal Foundation case. And as a consequence, we think it's appropriate for the court to look to Tennessee law to inform the discussion as to whether there is a risk of a conceptual severance, that we had the same issue in the Keystone case before the Supreme Court, or whether there is an honest and reasonable method for distinguishing the surface estate from the cold estate. Here, as in Wyoming, both Wyoming and Tennessee law, there is a history of separating the two, and therefore a substantially decreased risk of an enterprising conceptual severance. You've argued that the retention of a 3.5% royalty interest provides a basis to conclude that the coal rights are severed. On what basis do you contend that there's a severance simply by the retention of a royalty interest? Your Honor, we cite in the briefs to Tennessee appellate court decisions in which there is at least the implication that you cannot maintain a royalty interest in mineral estates without maintaining an actual severance between the mineral estate and the surface estate. But we would also argue that, as a matter of logic, you would have to maintain a severance because the royalty interest only operates on the production of minerals, not on the production of profits from the surface estate. Were you referring to the Pickens case? That is correct, Your Honor. Well, Pickens is a distinguishable case. Is it not? There was a retention of a half interest in the marble on the property, and the two parties became co-tenants, if I understand that case correctly. So there's clear interests in the property itself, as opposed to simply a right to a royalty. It seems to me that's quite a different set of facts. Your Honor, you're correct that Pickens does not squarely hold that a severance is affected by the retention of royalty interest. But we have not been able to find anything in Tennessee law precisely in point. And analogously, though, we do think that to speak of royalty interest within the context of a unified fee-simple estate is anomalous, that there has to be a conceptual distinction between a mineral estate and a surface estate when you are speaking about a subsurface mineral, in this case coal. I mean, I understand why you want to argue that. But if you're only talking about money or royalty, it hardly provides a compelling basis to conclude that property rights are severed. The lower court, Your Honor, did find in an earlier instantiation of this case that the royalty interest that Kane had held vis-a-vis its mining lessee, Eastern Minerals, did constitute a corporeal interest under Tennessee law, I believe. Of course, that's no longer an issue here because Kane is the complete and full owner of all of the minerals and surface estate now. But we would contend that it is supportable under Tennessee law to affect a severance and that, regardless, the coal estate itself is certainly recognized as a distinct property interest under Tennessee law. The other basis upon which both the lower court and the government attempted to distinguish Whitney benefits was the fact that there was not an express valuation afforded to the surface estate in Whitney, whereas in here we do have a finding as to what the surface estates were. And we would contend that that is a distinction without a difference principally because it is one thing to say that a surface estate is of speculative value, which is what this court said in Whitney benefits, and another thing to say that the surface estate has no value. And, of course, in order for the government to succeed on its categorical takings defense, it has to assert that in Whitney there was no value to the surface estate and, therefore, there was no reason to worry about the relevant parcel analysis and whether we should aggregate the mineral and surface estates. But a close look at the opinion of both this court and of Judge Smith's original trial court opinion reveals that there was never any dispute that there was surely some value to that surface estate, which was farmland. The question was whether it was legally relevant to the takings analysis, and both Judge Smith and this court on appeal determined that it was not legally relevant, regardless of whatever value might be ascribed to it. And so, therefore, here, regardless of the value in the surface estate that the lower court has ascribed to Kane's property should not affect this court's categorical takings analysis of the mineral estate and of Kane's whole estate. We also contend, of course, that the trial court erred in aggregating Kane's non-contiguous mining parcels. The lower court thought that it was appropriate to combine them together to judge the economic impact of Smackler because there was a unified mining plan. But we contend that there is nothing in the record that could support what this court has in the past determined to be sufficient to support aggregation of non-contiguous parcels. Mr. Schiff, if we don't agree with you on the categorical taking point, do you agree that there was no reasonable investment-backed expectation that there wouldn't be this kind of regulation? No, Your Honor. We do contend that Kane could have a reasonable investment-backed expectation of some profit. And it's that crucial distinction upon which we can distinguish this case from every other case that the government has cited, including the Forest Properties case, the Apollo Fuels case, in which the plaintiffs in those cases retain some value to their investment. To conclude, however, that the passage of Smackler precludes Kane from having any investment-backed expectation of any return is tantamount to enforcing the notice rule that the Supreme Court specifically disavowed in Palazzolo. We believe that at the very least, Kane should have had some expectation of some return, especially when you consider that the unsuitable-for-mining designation in this case was a product of the Secretary's discretionary authority, not his mandatory authority. He did not determine that reclamation of this mining area was impossible and therefore the designation was required. Rather, he determined that because of the effects on fragile lands and land use in the area, that it would be best not to have mining. But it was not mandated by the statute. All the more reason why we think that to hold Kane, Tennessee as being a frivolous investor in 1979 at a time when even Smackler itself says that continued reliance upon coal is crucial to reducing the nation's reliance upon foreign sources of energy. All the more reason why we think it would have been reasonable to invest in coal property, given that not only was coal mining proceeding at the time on those parcels, at least one parcel, but there was coal mining in the vicinity in the Cumberland Plateau at the time of purchase. Lots of other companies, Peabody included, had come in and walked away from the situation. Why did your client not sort of think about that before he jumped on the coal aspect of this property? Certainly, Your Honor, it was mentioned in the investment materials that there had been persons interested in who had not followed through. But didn't the investment materials say more than that? And they actually talked about the questionable ability to get a permit and things like that. Why didn't all that create a reasonable concern for him? I cannot speak directly for the state of mind of Kane, Tennessee, but I can say that immediately after the property was purchased, the Eastern Minerals Company, the lessee, was able to obtain two consecutive permits for beginning the process of mining. So notwithstanding the perhaps hesitancy of other investors, once Kane did become involved, it looked like, at least for the first several years, that things were going well, and that any sort of reluctance on Kane's part was not borne out by its immediate experience. Mr. Schiff, you're into your rebuttal time. I assume you'd like to save it?  Ms. Tardiff for the government. Good morning. May it please the Court, Chris Tardiff for the United States. In this appeal, Kane seeks to establish a taking by doing precisely what the Supreme Court has repeatedly and consistently told us that landowners cannot do, and that is to divide its fee-simple ownership in approximately 10,000 acres of land into two segments, so that it can then argue that the regulated segment of its property has been taken in its entirety. In arguing for such segmentation, Kane is essentially asking the Court to put blinders on and ignore certain undisputed facts, including the undisputed fact established at trial in this case, that the regulation at issue here did not deprive it of all economically beneficial use of its property, of its parcel as a whole, and in fact that Kane's land had a fair market value at the time of the, or date of the alleged taking, notwithstanding the regulation, of somewhere between $3.9 and $4.8 million. That figure didn't even include consideration of the fact that Kane had sold off one of the five parcels of land prior to the regulatory restriction, that would be the Pyle-Denau track, and that it had also sold off another section of the Kane main track, the large track, into a joint venture and proceeded with a residential development of that portion of its property. So there were clearly other uses of the property available. Kane was pursuing those other uses. All the regulation did was restrict coal mining on the property. The circular reasoning that Kane employs here and argues in favor was most recently rejected by the Supreme Court in the Tahoe case, a decision that postdates this Court's decision in Whitney Benefits, and as explained in the Tahoe case, and I quote, defining the property interest taken in terms of the very regulation being challenged is circular. With property so divided, every delay would become a total ban. The moratorium and normal permit process alike would constitute categorical takings. The Supreme Court in Tahoe went on to reject the landowner's attempt in that case to sever its fee simple ownership of land on a temporal basis, finding that that type of conceptual severance argument was unavailing because it ignores Penn Central's statement that regulatory takings cases must focus on the parcel as a whole. So Kane in this case would ask this Court to essentially ignore the parcel as a whole and treat Whitney Benefits as... Do you think Whitney Benefits is distinguishable or overruled? I don't think Whitney Benefits, it is definitely distinguishable on the facts. I wouldn't say it is overruled necessarily by Tahoe, but certainly Whitney needs to be read in light of subsequent decisions by the Supreme Court and particularly the Tahoe case. On the facts, well a couple of things about Whitney Benefits. First of all, Whitney Benefits was a Penn Central case. It was analyzed under Penn Central because it preceded Lucas. So even if you look at Whitney Benefits and say, well in that case the relevant parcel was just the Cole estate because that's all that Whitney Benefits owned and ever owned, it doesn't necessarily follow that you're in Lucas category and you're ignoring expectations and other facts. Now in this particular case, the trial court's analysis of the relevant parcel issue through a series of cross motions for summary judgment by the parties is well supported by the facts of this case. The trial court applied the test set out by this court in cases such as Forrest Properties that say we apply a flexible approach designed to account for factual nuances. That language is in Forrest Properties, also came out of Love Ladies Harbor in an earlier decision. So the trial court applied exactly that factual approach and found that the relevant parcel in this case was the fee simple ownership that Cain acquired in 1979. Several key facts support that finding. The subject property was marketed to Cain as a single investment opportunity. No dispute about that. Cain subsequently purchased the property, all five tracts, as part of a single transaction. Cain subsequently treated all of the tracts that it purchased in this single transaction as a single economic unit and that's probably best evidenced by the fact that immediately after buying the property in February of 1979, it turned around and leased the entire property to one entity and other newly formed corporations. All the facts with regard to why it's a single property, I agree with you, but I do have one question. You know, it was confusing to me at first in the brief, in the government's brief, and as you say it now, you keep talking about how it all occurred and they purchased it as a single transaction. I don't think that's exactly right, though, isn't it? It was really two transactions, but two days apart, negotiated together, all of that. I mean, but it wasn't actually a single transaction, technically. Well, it was a single transaction in that, again, it was presented as a single investment opportunity. There were two deeds to transfer the property to Cain because the Wyatt family, which has acquired all of this property in 1953, had subsequently divided its ownership among the family members so that the Wyatt parents owned two of the tracts. They had transferred the remaining three to a trust set up for the benefit of their three children. So there were two deeds executed, one from the Wyatt parents, one from the children, executed two days apart. The deeds are identical in form, prepared by the same law firm. They were recorded on the same day, one right after another. So even though there were two deeds, it was one transaction. And that's, the fact that it was two deeds, and even if you viewed it as two transactions, doesn't preclude those parcels from being brought together as a single relevant parcel. And Forest Properties is an excellent example of that. In Forest Properties, you have the plaintiff having acquired fee-simple interest in an upland parcel through a subsequent and separate transaction acquiring an equitable interest in an adjacent wetlands parcel through an auction contract. And the court said it's perfectly appropriate to treat those two parcels of property acquired separately as a single relevant parcel because they were treated as a single economic unit. And again, we have the same situation here. You have the transfer of the rights to use the property to Eastern Minerals through a single lease. Now interestingly enough, that lease didn't restrict Eastern Minerals to using the property for coal. That was certainly a primary goal of it, but Eastern Minerals was also permitted to harvest timber from the property. That's right in the terms of the lease. Interestingly enough, recognizing that the property had other surface use in particular, the lease also goes on to say that before Eastern Minerals proceeds to use either mine coal or harvest timber, it needs to give Kane 90 days notice prior to engaging in that activity so that Kane and his lessee can make sure that the lessee's activities are not going to interfere with Kane's other use or development of the surface. So again, even through that lease, there was recognition that this entire fee simple ownership for the property, that there were multiple possible uses, coal mining simply being one of them. Ms. Tardif, what is your position on the reasonable investment backed expectation issue? A couple of positions. First of all, it is certainly the government's position that reasonable investment backed expectations are a factor in every regulatory takings claim, and that's whether we're under Lucas or under a Penn Central analysis. Here we believe the trial court was absolutely correct in treating this as a Penn Central case and proceeding to, as a result, discuss expectations on that. With respect to the merits of the trial court's analysis on expectations, again, we think that that decision that the particular regulation here did not interfere with Kane's reasonable investment backed expectations is well supported in the record. Factually, Kane invested in this property in 1979, tail end of the energy crisis we had, the OPEC crisis beginning in 1973. There was clearly a renewed focus on coal resources in the years that followed, and that's evidence in the record. Mr. Bernos, who formed the Eastern Minerals property, first contacted Mr. Wyatt about this property in 1974, immediately after the OPEC crisis, began attempts to develop this property to bring in an experienced coal company to assist. Every experienced coal company that looked at this property walked away. So what do you have in the end? You have Citibank came into the picture to find an investor for the property. The folks at Citibank, no experience with coal property. They market it. They find a foreign investor to invest in the property. That investor has no experience in coal properties. Kane then leases the property to Eastern Minerals, a newly formed corporation that also has no experience in coal mining and has extreme difficulty over subsequent years finding anyone with experience to come in and help them develop this property. At the time of acquisition, it was also readily apparent through the investment information provided by Citibank that there were regulations regarding coal that might impact the ability to develop a large scale coal mining operation on this particular property. That investment information specified that permits may not be obtainable. And the reason for that is fairly obvious when you look again at the specific parcel of property. The Kane main track, which is the largest of the tracks and where most of the coal was believed to be located, is adjacent to Fall Creek Falls State Park, the crown jewel of the Tennessee State Park system. There was no history, though, of regulatory enforcement on this property. Is that right? So there was some regulatory history and some coal mining took place. Here, again, we had a large scale coal mining proposal involving coal on the main track, which again abuts the state park, but not just abuts the state park, but is in shares of watershed with the state park. And in Creek, which feeds some of the waterfalls in the park, flows directly through the main track, directly over the coal in question. So there were environmental issues. And SMAFRA was enacted at a time where, yes, as Kane indicates, there was some renewed focus on domestic energy sources, including coal. It was also enacted at a time where there was an increasing awareness of the environmental impacts of coal mining and the need to balance those two. So certainly when you're assessing expectations of any property owner, again, it's very fact-intensive, and that's the whole goal of the inquiry is to look at the specific facts of the case. So we would submit that based on the factual record in this case, the history of the property, which was certainly known and knowable to any investor, that the trial court's determination that Kane did not have reasonable investment-backed expectations that were interfered with by the regulation is correct and should be affirmed. Thank you. Thank you. So again, whether the coal estate has or has not been severed, although we believe it was not, ultimately that doesn't matter in this particular case. You're running down. Do you have a final point to make to see if I have any final points to make? I believe I've covered everything that we wanted to cover today. As a final note, I would point out here that Kane has only challenged the decision here by trying to get its claim into a Lucas box, and again, by narrowing the court's focus to just its coal estate, which is contrary to the teachings of Tahoe. So as a result of that, they would like the court to then also ignore all of the trial court's findings regarding expectations. Again, that's not appropriate. Expectations really are a factor in every case, including a case under Lucas. For all of those reasons, we would submit that the trial court's findings that there was no permanent regulatory take into Kane's property should be affirmed. Thank you, Ms. Toder. Thank you. Mr. Schiff has a little time left. Thank you, Your Honor. I should emphasize that Whitney Benefits is fully consistent with Tahoe Sierra. If we were to draw a true analogy between Tahoe Sierra in this case, we would have to say that Smacker imposed a rolling series of development moratoria on Kane's coal estate. The obvious reluctance of the Supreme Court to permit litigants to divide up their fees is based upon, for example, in Tahoe Sierra, the idea that these moratoria were simply constructed for purposes of litigation. Just like in the Penn Central case, the development rights that Penn Central claimed were lost were air rights that had no particularly distinct or rich history in state law. But in consequence, here, we have a clear history under Tennessee law of the coal estate, the mineral estate, being recognized as a separate and distinct legal estate. And therefore, there is no risk of a conceptual severance of fomenting enterprising litigants to shoehorn their claims into the Lucas framework. There has been a decision in this court in Whitney Benefits that says that it is appropriate to look at the coal estate as the parcel as a whole, especially in the Smacker context. And we believe that, in this case, Kane falls into that precedent. And as far as the notion of a single economic investment, we believe that the record clearly supports the conclusion that this is a coal investment. Obviously, there are values that come with the surface estate. But the same thing was true of the surface estate in Whitney Benefits. And yet, the purpose of the transaction there, as is the purpose of the transaction here, was to make profitable use of the coal. And we contend that the lower court's decision to the contrary is incorrect and should, therefore, be reversed. Thank you, Mr. Schiff. We take your case under revision.